# Norris *against* Monen.

What lands are described by a warrant, must be judged of from the warrant itself, and from testimony descriptive of their local situation: the intention of the warrantee, as to the lands designed to be appropriated, is not a subject which should be inquired into.

The testimony of a witness who is dead, or out of the state, which was given in a trial of an ejectment by one tenant in common, cannot be given in evidence in the trial of an ejectment for part of the same land by another tenant in common.

In what cases the field notes of a former deputy surveyor, or a draft made by him, or by a person who was his known and acknowledged assistant, and when such testimony may be given as evidence of title and boundary, is here examined.

WRIT of error to the common pleas of *Huntingdon* county.

This was an action of ejectment by Adam Monen and Elizabeth his wife, and others, against John Norris and John Norris, Jun. On the trial of the cause the plaintiffs offered in evidence a draft, purporting to be a draft of James Roberts, of three hundred and forty acres of land, and to have been made by Joshua Elder; offered because it was referred to in all the deeds, and had accompanied the possession of the land; both parties claiming under the same com-

III.——3 I

mon ancestor, and the survey not having been returned : it was also produced by the defendant, on notice.  It was objected to, and the objection overruled, and exception taken by the defendant.

The plaintiff next offered evidence of declarations of Joseph Norris, after he took out the warrant, and before he conveyed it to his son, as to the land he intended to claim under it : this was objected to, but the objection was overruled and exception taken.

The plaintiff also offered to prove what was sworn to by a witness now deceased, on a trial of an ejectment for another part of the same land by co-tenants in common of the present plaintiffs against the same defendants : this was objected to, and the objection was overruled, and exception taken by the defendants.  These bills of exception were the subjects of the errors assigned, as also the opinion of the court, but which gave rise to the decision of no principle.

*Bell* and *Miles*, for plaintiff in error.
*Potter*, for defendant in error.

The opinion of the Court was delivered by

Huston, J.—This case has called the attention of this court to some points which are perhaps not precisely settled under all circumstances, and to some which I had supposed were conclusively settled.

In what cases the field notes of a former deputy surveyor, or a draft made by him, or by a person who was his known and acknowledged assistant, can be given in evidence, seems not to be settled with as much precision as could be wished.  The old cases, and those of late date, do not appear altogether consistent.  On reflection, perhaps, this will not appear strange; and perhaps the time may come, and is come in many cases and under many circumstances, when such field notes or drafts, no matter where they are found, ought not to be received in evidence to destroy a regular office title, and in such cases need not be given in evidence to support it.

For a short period after a survey has been made and returned, and which interferes with an adverse claim, and while the original owner, or those having notice of the dispute are interested, every thing relating to the survey, every person present at making it, and all drafts made by the deputy surveyor or his assistant, or their field notes, have been given in evidence, and would be yet, in case of a late survey and interfering claims, as in Adams v. Goodlander, 2 *Yeates* 313 ; Blaine v. Johnson, 3 *Binn.* 103, where it seems to be conceded that the papers would have been received if produced at the trial.

Another class of cases is, where two surveys have been made on the ground interfering with each other, or one survey including land claimed by another under improvement, and both parties in possession of parts of their respective claims; in such cases it is material to settle and decide what were the rights of the parties originally, what land

[Norris v. Monen.]

was originally comprised in the oldest survey, and when and how the lines were changed. Adams *v.* Goodlander, before cited, and Biddle *v.* Dougall, 2 *Binn.* 37.

Another class of cases is to be found, in which the allegation was, that surveys made for one person in pursuance of his application were afterwards returned to the land office on another warrant or application belonging to another man, and drafts in the office of the deputy surveyor, or field notes, were sometimes resorted to as proof of the alleged fraud of the surveyor.

It will be necessary to distinguish between the earlier cases, in which the right of the defendant was not protected by twenty-one years possession, and later cases in which the statute of limitations applied, in which such papers have been often rejected; and individually, my opinion is, that where a survey has been returned to the land office, which, at the time it was returned, did injustice to no one, interfered with the rights of no one, and the owner has taken possession while no person had any pretence of adverse right, or has sold to a *bona fide* purchaser before any adverse right, no field notes, or drafts (or declarations of a deputy surveyor) found in the office, or out of the office, ought to be received to destroy in part or in whole the title to such tract, so possessed or sold agreeably to a return filed in the land office.    Clearly, after twenty-one years possession, such proof must be unavailing against the person in possession, and is not necessary to support his title.

All this, however, is not to the point in the present cause, for here the draft made by Elder was not given in evidence, as I understand, to show title, or for any other purpose than to show the extent and limits of a title, founded originally on improvement and actual settlement, commenced so long ago that no one now alive can fix its date, and continued without interruption since the oldest witnesses can remember it: and in this case too, both parties claimed under him who was the owner of this improvement in 1768.    In addition to this, the defendant holds two hundred acres, part of the old improvement, by a deed from judge Norris, grandfather of plaintiffs and father of defendants, which deed refers to a survey.    The draft offered was proved to be in the handwriting of Joshua Elder, an assistant of Richard Lea, then deputy surveyor of the district. An application had been taken out by Joseph Roberts, the original settler on this land, on the 27th of October 1766.    The draft did not show, by any thing on the face of it, whether it was made in pursuance of the location, or to designate the boundaries of Roberts's improvement; but on the back of it was a transfer of it to William Morgan, corresponding with, but not referring to the deed from Norris to Morgan; and some of the subsequent transfers of the title were noted on the back of it.    It was evidence in this case, whether viewed as made in pursuance of the location (in which point of view there could be no doubt, for as the survey had not been returned, and all claimed under it, it was, though not conclusive, certainly

evidence of the situation and extent of the claim), or shown as evidence of the exact situation and extent of the improvement. In the early case of M'Curdy v. Potts, in *Dallas's Reports,* Chief Justice M'Kean spoke of improvement rights as if they vested no right beyond the enclosed land; but as early as 1795, in Smith's Lessee v. Brown, 1 *Yeates* 516, he sanctioned what we call a consentible line between improvers: now such lines can have no validity unless the parties have rights which are to be bound; and from that time to this, the right of the first settler on vacant land to three hundred acres, if his settlement was made before 1776, or to four hundred acres, if made since 1780, has not been contested, unless on the ground that he did not intend to take so much; or had agreed to consentible lines which did not leave him so much; or that there was not so much vacant land; or, if there was, that he had suffered others to settle near him, or to survey near to him, and had not given notice of the extent of his claim. Gilday v. Watson, 2 *Serg. & Rawle* 410; Gordon v. Moore, 5 *Binn.* 186; Duncan v. Keifer, 4 *Binn.* 161; Elliot v. Bonnet, 3 *Yeates* 287; Devebaugh v. Bonnet, 3 *Binn.* 175.

Now if a line, designating boundary, fixes the extent of a claim, when made without a surveyor and compass, it would not be easy to give a reason why one made more solemnly and more correctly should have less effect. To be sure it is not of the same force and validity as an official survey returned to the office of the surveyor-general; but still it is evidence where no survey is returned to show the locality and extent of the claim; and when accompanied by possession and constant ownership, as in this case, may be very important evidence.

The conveyances, by which the right of Roberts was vested in Joseph Norris, on their face, transferred the property to him, not to him and his heirs; and in 1800 he obtained a deed of confirmation from the heirs of Roberts, vesting the property in him in fee; but before this he had sold two hundred acres of it to his son John, the defendant, and he then gave John a new deed for that part.

While his title was supposed to be imperfect, however, viz. the 11th of March 1793, he took a warrant in his own name for one hundred and fifty acres, including an improvement on the west side of the Raystown branch of the Juniata river, adjoining lands of Alexander Huston on the northwest, vacant land on the north, and other land of said Norris on the east, in Hopewell township, in the county of Huntingdon. *Interest from the 1st of October* 1762.

This warrant would seem to be precisely descriptive of some land, and yet the cause perhaps turned on what land it called for. It was not surveyed during the lifetime of Joseph Norris. On the 14th of April 1806, Joseph Norris conveyed to his son John, the defendant, a certain *tract or messuage of land,* lying, being and situate on the west, &c., (in the very words used in the warrant) *held by virtue of*

[Norris v. Monen.]

*a warrant* issued out of the land office, &c. in the name of Joseph Norris, dated the 11th of March 1793.

All the witnesses agreed that what was then called A. Huston's place adjoined the old survey of Joseph Norris on the northwest; and it was proved and conceded here, that Joseph Norris owned a tract of land called M'Bride's Bottom, adjoining the survey made by Elder, on the eastern side; and no witness proved or spoke of any improvement made in 1762, except that made by Roberts within Elder's survey, and where old Joseph Norris lived. As all these seemed to fix this warrant to the spot on which old Joseph, who took it out, lived, this was attempted to be resisted and disproved by parol evidence, that although the words of the warrant called for that land, yet the intention of Joseph Norris was to apply for and to take the land claimed by Alexander Huston, or land between his own old survey and Alexander Huston, if there was any land between them.

There was a time in this state when the question, what land a warrant or location called for, was of frequent occurrence in courts, and was, I believe, uniformly decided in the same way. In latter times this question has rarely occurred, and it would seem that on the trial those cases were not brought to the recollection of the judge. I shall refer to a few of them.

A warrant must be judged of as it appears on the face of it; and whether it is sufficiently descriptive of, or locates precisely the lands in question, can only be determined by testimony ascertaining the local situation of the lands, and of the natural or artificial boundaries mentioned in the warrant. The intention of the party is of no moment unless reduced to writing in the warrant. Nesbit *v.* Rankin, 1 *Yeates* 285; decided by M'Kean and Yeates in 1793. "The efficacy of an application must depend on the written words of it: this is the only notice the applier gives of his intention to appropriate certain lands, and the adverse party shall only be affected therewith;" by the same judges in 1797. Mauss *v.* Galbreath, 2 *Yeates* 244.

On the 3d of April 1769, many applications were entered on the same day, and the owners of each applied for a survey immediately. The preciseness of description was often very material. In De Haas *v.* Galbreath, 2 *Yeates* 315, the lowest number was postponed. The court say, the plaintiff's application calls for lands adjoining the path and eastward of the path; but the survey includes the path, and a great part of it lies west of the path; and a verdict was rendered for defendant, whose application was more pointed to the lands. Decided by Shippen and Yeates in 1797.

In 2 *Yeates* 448, the same doctrine is applied to the words of a Virginia certificate, by Yeates and Smith, justices.

It was then an oversight in the judge to admit parol evidence of what Joseph Norris said at the time of making his application, or at any time, as to what land he intended to take. It was competent to prove where the land of Huston lay; what lands Joseph Norris

[Norris v. Monen.]

owned which might answer the other call for boundary; and, not the least material, to prove where there was an improvement made in 1762; for such an improvement was to be included, unless Joseph Norris intended a fraud. But after these are proved, it cannot be permitted to prove that the applicant for a warrant meant to take other lands than those called for by the words of the warrant.

There was another matter occurred on the trial. Certain other heirs of Joseph Norris had brought a former ejectment against the present defendant to recover their respective shares. It was offered to prove in this cause what was testified in that by a witness who is dead, or removed from this state; and admitted. Now, although that suit was for certain aliquot parts of the same tract of land, yet it was for different parts. The plaintiffs there did not claim under the present plaintiffs; nor do the present plaintiffs claim under those who were plaintiffs in that cause. The present defendant could not use depositions taken in that cause against the present plaintiffs, for they had no opportunity to cross-examine, and it must be reciprocal; if each side could not use depositions taken in that cause, neither could use them. Besides, it has been decided by this court, that tenants in common, when one is plaintiff alone, may be witnesses for each other; which could not be if each cause was the same.

There are several exceptions to the charge. It would seem to me the counsel attempt to put a construction on some parts of it which it will not bear. The judge does not say that the deed of 1806, Joseph Norris to John Norris, conveyed *only* the warrant; he says expressly that he conveyed land *held by the warrant.*

The fourth exception to the charge seems not to be supported, though in that part the charge might have been more explicit. Defendant showed two deeds from Joseph Norris. The first had nothing to do with the conveyance of the land in dispute: it conveyed two hundred acres, part of the Elder survey, and the confirmation in 1800 is of this two hundred acres. The second deed for land held by the warrant is six years after this. The deeds of confirmation in 1800 could not confirm the land in question to the defendant, for it was not pretended it was sold to him before 1806.

I am not sure there was any wrong in giving Joseph Norris a warrant in 1793, founded on an improvement in 1762; the act of 1784 offers lands at 10 pounds per hundred acres, and where they are improved requires the time of the improvement to be stated, that interest may be charged accordingly. Joseph Norris applied for land, and stated the commencement of his improvement in 1762. There is no pretence that it commenced earlier: he was guilty of no fraud. The officers of the land office, and not he, fixed the price. He did all he was bound to do, and did it fairly: besides I think 10 pounds per hundred acres the proper price.

Judgment reversed, and a *venire de novo* awarded.